# FRENCH–GLENN LIVE STOCK COMPANY *v.* SPRINGER.

### ERROR TO THE SUPREME COURT OF THE STATE OF OREGON.

No. 124. Argued January 20, 21, 1902.—Decided April 7, 1902.

A Federal question was presented by the contentions of the plaintiff in error, and this court is of opinion, that while there was a lake abutting on or to the north of the lots, the plaintiff would take all land between the meander line and the water, and all accretions, it was competent for the defendant to show that there was not, at the time of the survey, nor since, any such lake, and to contend that, in such a state of facts there could be no intervening land, and no accretion by reliction.

THIS was an action brought, in 1896, in the Circuit Court of Harney County, State of Oregon, by the French-Glenn Live Stock Company, a corporation of the State of California, against Alva Springer, to recover possession of a certain tract of land situated in said county. The action was tried in May, 1897, and resulted in a verdict and judgment in favor of the defendant. The cause was subsequently taken to the Supreme Court of Oregon, and by that court, on August 11, 1899, the judgment of the Circuit Court was affirmed; and thereupon a writ of error was allowed by the Chief Justice of that court, and the cause was brought to this court.

The facts of the case, as developed at the trial, were thus stated by the Supreme Court:

" The plaintiff, to support its contention of ownership of the fee, offered in evidence, (1) the official plat of the United States government survey of fractional township 26 south, range 31 east, of the Willamette meridian, showing the township rendered fractional by abutting upon the meander line along the south side of Malheur Lake, which plat appears to have been approved by the Land Department of the government and filed in the local office on September 17, 1877; the plat shows said lots as bounded on the north by the meander line of Malheur Lake; (2) the field notes of the survey of the exterior boundaries of said township and its subdivisions, and the meander line of Malheur Lake, under the title heading, ' Meanders of the south shore of Malheur Lake, through fractional township, 26,' etc., and indicating that it was run ' with the meander of the lake; ' (3) a list of selections of land, made by the agent of the State of Oregon, claimed as swamp and overflowed, with the approval of the Secretary of the Interior, bearing date September 19, 1889; (4) two patents from the United States, for said lots 3 and 4, section 34, and 1 and 2, section 35, ' according to the official plats of the survey of the said lands returned to the General Land Office by the surveyor general.' The patents bear date March 10, 1890, and October 8, 1891, respectively. The lots contain, in the aggregate, 158.53 acres; (5) two conveyances from the State, comprising the above-described lots, bearing date October 7, 1889, and April 30, 1890, respectively, and other mesne conveyances to the plaintiff; and (6) oral evidence, tending to prove that in 1877, and for some years thereafter, Malheur Lake was a continuous body of water up to the meander line of that year; that there was a narrow ridge or reef across the west end thereof, some 12 or 15 miles west of the lands in dispute, which separated its waters from those of Harney Lake; that its waters were from 8 to 12 feet higher than those of Harney Lake; that, in 1881, the waters of Malheur Lake, overflowing the ridge, cut a channel through, which was enlarged from year to year for some time; that, as a result, its surface was lowered, the waters receding from the flat shelving shore, leaving the disputed land bare, except in the spring time, from and after 1884. This constituted the

plaintiff's case. On behalf of the defendant, evidence was introduced tending to show that there never was a lake in front of the said lots; that Malheur Lake is a well-defined, natural body of water, but that, if the east and west exterior lines of said lots were extended north indefinitely, they would not touch or intersect the margin or border of said lake, but would leave it entirely to the east thereof; that the water of the lake had been, from a time prior to 1877, of about the same height as it was at the date of trial; that the border of the lake never at any time extended to the supposed meander line of 1877, and that there never had been any recession of the water of the lake, and no consequent reliction of land in front of the said lots."

*Mr. Charles A. Keigwin* for plaintiff in error.

*Mr. C. E. S. Wood* for defendant in error. *Mr. Lionel R. Webster* and *Mr. Thomas D. Rambaut* were on his brief.

Mr. JUSTICE SHIRAS, after making the above statement, delivered the opinion of the court.

The parties to this contest both claim under titles derived from the United States—the plaintiff in error under patents granted to the State of Oregon under the swamp land grant; the defendant in error under the homestead laws.

To support its contention the plaintiff in error put in evidence, at the trial, an official plat of the government survey of township 26 south, range 31 east, of the Willamette meridian, showing the township rendered fractional by abutting upon the meander line along the south side of Malheur Lake, which plat appears to have been approved by the Land Department and filed in the local land office on September 17, 1877. The plat shows lots 3 and 4, section 34, and lots 1 and 2, section 35, as bounded on the north by the meander line of Malheur Lake; also, a list of selections of land, made by the agent of the State of Oregon, claimed as swamp and overflowed, with the approval of the Secretary of the Interior, bearing date September 19,

1889; also two patents from the United States for said lots, dated, respectively, March 10, 1890, and October 8, 1891— said lots containing in the aggregate 158.53 acres; also, two conveyances from the State of Oregon, comprising the said lots, bearing date October 7, 1889, and April 30, 1890, respectively, and certain mesne conveyances of said lots, vesting title in the plaintiff in error in 1894; also, oral evidence, tending to prove that in 1877, and for some years thereafter, Malheur Lake was a continuous body of water up to the meander line of that year; that there was a narrow ridge or reef across the west end thereof, some twelve or fifteen miles west of the lands in dispute, which separated its waters from those of Harney Lake; that its waters were from eight to twelve feet higher than those of Harney Lake; that, in 1881, the waters of Malheur Lake, overflowing the ridge between the lakes, cut a channel through, which was enlarged from year to year for some time; that, as a result, the surface of Malheur Lake was lowered, the waters receding from the flat, shelving shore, leaving the disputed land bare, except in the spring time, from and after 1884.

On the part of the defendant, whose possession began in July, 1888, evidence was put in tending to show that there never was a lake in front of the said lots; that Malheur Lake is a well-defined, natural body of water, but that, if the east and west exterior lines of said lots were extended north indefinitely, they would not touch or intersect the margin or border of the lake, but would leave it entirely to the east thereof; that the water of the lake had been, from a time prior to 1877, of about the same height as it was at the date of trial; that the border of the lake never at any time extended to the supposed meander line of 1877, and that there never had been any recession of the water of the lake and a consequent reliction of land in front of the said lots.

The question of fact, raised by this contradictory evidence, was submitted to the jury, whose verdict decided the issue in favor of the defendant in error.

The land in dispute, in the possession of the defendant in error, was not included within the lines of the original survey, nor in the description of the lots contained in the patents and

in the deeds of conveyance under which the plaintiff in error holds, and to add the land in controversy to the lots so described would more than double the area of the land claimed by the plaintiff in error; but the contention of the plaintiff in error was, in the courts below and now is, in this court, that, as the plaintiff in error bought in reliance upon the plats and patents which showed the meander line of the lake, such plats and patents must be deemed to conclusively establish that the lake was the northern boundary of the land, so far as the rights of riparian grantees are concerned.

Respecting this contention, the defendant in error advances two propositions—first, that the grantee of swamps and overflowed lands takes only such lands as are of that special character, and that this land under the water, forming the bed of the lake, not being of that character, could not pass, even under the facts as claimed to exist under the evidence of the plaintiff in error; and, second, that there never existed a lake in front of or bordering on the plaintiff in error's lots; that if such was the fact, the rule as respects accretion by reason of the alleged recession of the water would not apply; and that as this question was submitted to the jury and found against the plaintiff in error, such finding conclusively determines the controversy.

While it may be conceded that the description of the lots contained in the survey, plats and patents are conclusive as against the government and holders of homesteads, so far as the lands actually described and granted are concerned, such conclusive presumption cannot be held to extend to lands not included within the lines of the survey, and which are only claimed because of the alleged existence of a lake or body of water bounding said lots, whose recession has left bare land accruing to the owners of the abutting lots. We agree with the Supreme Court of Oregon in thinking that the question whether the northern boundary of the lots of the plaintiff in error was an existing lake, the recession of whose waters would leave the bed of the lake, thus laid bare, to accrue to the owner of the lots, was a question of fact which was not concluded by a mere call for a meander line. If, indeed, there had been a lake in front of these lots at the time of the survey, which lake had

subsequently receded from the platted meander line, the claim of the owner of the lots to the increment thus occasioned might be conceded to be good, if such were the law of the State in which the lands were situated. But if there never was such a lake—no water forming an actual and visible boundary—on the north end of the lots, it would seem unreasonable, either to prolong the side lines of the survey indefinitely until a lake should be found, or to change the situs of the lots laterally in order to adapt it to a neighboring lake. The jury having found that the facts under this issue were as claimed by the defendant in error, the conclusion must be that the rights of the plaintiff in error must be regarded as existing within the actual lines and distances laid down in the survey and to the extent of the acreage called for in the patents, and that the meander line was intended to be the boundary line of the fractional section.

In *Niles* v. *Cedar Point Club*, 175 U. S. 300, a somewhat similar state of facts existed, and it was claimed that the mere call for a meander line gave riparian rights beyond that line. But this court said:

"It is urged that the fact that a meandered line was run amounts to a determination by the land department that the surveyed fractional sections bordered on a body of water, navigable or non-navigable, and that, therefore, the purchaser of these fractional sections was entitled to riparian rights; and this in face of the express declaration of the field notes and plat, that that which was lying beyond the surveyed sections was 'flag marsh,' or 'impassable marsh and water.' But there is no such magic in a meandered line. All that can be said of it is that it is an irregular line which bounds a body of land, and beyond that boundary there may be found forest or prairie, land or water, government or Indian reservation."

See likewise *Horne* v. *Smith*, 159 U. S. 40, where a similar ruling was made.

Whether, even if the meander line of the survey really ran along and adjacent to Malheur Lake, the doctrine of *Hardin* v. *Jardasa*, 140 U. S. 384, and cognate cases, is applicable, is discussed at some length in the briefs. According to that rule, the extent of the title of a government grantee of lands bounded

on streams and waters, without any reservation or restriction of terms, is to be construed, as to its effect, according to the law of the State in which the lands lie; and the cases cited show that, in some of the States, it is held that the title of a riparian proprietor extends to the middle thread of the stream, while in others it is held to extend only to the water's edge; and in Massachusetts, and perhaps other States, a distinction is recognized between lands bordering on lakes and ponds, and those bounded by running streams.

But we are not called upon to enter into that discussion in the present case, for the Supreme Court of Oregon reached its conclusion apart from any such question, and expressed itself as follows:

"If there never was a lake in front of plaintiff's lots, or if one did not exist there at the time of the survey, then there was no natural object or monument marking the north boundary of the lots; hence resort must be had to the secondary evidence, viz., the courses and distances which are ascertainable from the plats and surveys, and they must prevail. The result is natural, and the land conveyed would be just what a mathematical calculation would produce from the field notes of the survey of the fractional sections and the supposed meander line. . . . The plaintiff sought to sustain the fact of the actual existence of the lake in front of its lots and upon which they abutted at the time of the survey, and then to show a gradual subsidence of the water of the lake, due to the cutting of the channel from natural causes, through a narrow ridge or reef extending across between Malheur and Harney Lakes, by which the water of the former was drawn off into the latter, and a consequent reliction of the land bordering on said lots, which constitutes the land in dispute, and to which plaintiff claims title. The defendant controverted this position, and sought and introduced evidence tending to show the non-existence of such a lake at the time of the survey, and at all times since; in short, there was support for the whole of his contention. The fact of the existence of Malheur Lake, a non-navigable body of water, was admitted, but there was evidence to show that it lies to the northeast of the lots of the plaintiff, and that no part of it now, or at the

time of the survey, extended westward, in front or to the north of them. . . . The issues of fact were clear and distinct, and having been submitted to the jury, there is no reason why their verdict should not preclude the plaintiff, as in other cases when a jury has passed upon a submitted question of fact."

As the case went off in the Oregon courts on this question of fact, it may be questionable whether any matter of Federal law is left open for our revision. However, as the plaintiff in error contended, in the courts below and in this court, that a proper construction of the survey and patents gave riparian rights covering the land in dispute, and that it was not competent to overcome such rights by evidence affecting the legal import of the plats and patents, we think a Federal question is thus presented.

For the reasons already given, we think that, while the plats are conclusive as to the meander line, and while if there was a lake abutting on or to the north of the lots, the plaintiff in error would take all land between the meander line and the water, and all accretions, it was competent for the defendant to show that there was not, at the time of the survey nor since, any such lake, and to contend that, in such a state of facts, there could be no intervening land and no accretion by reliction.

The judgment of the Supreme Court of Oregon is

*Affirmed.*

MR. JUSTICE HARLAN took no part in the decision of this case.