71 So.2d 874

**BILBO LIVESTOCK & LAND CO., Inc.**

v.

**HENSON.**

I Div. 546.

Supreme Court of Alabama.

March 4, 1954.

Rehearing Denied April 22, 1954.

establishing the disputed boundary line. The motion to transfer was granted and

Van Antwerp & Rector, Mobile, for appellant.

Adams & Gillmore, Grove Hill, for appellee.

STAKELY, Justice.

This case originated on the law side of the Circuit Court of Washington County in a suit for trespass filed by Bilbo Livestock & Land Company, Inc., a corporation, against L. T. Henson. The defendant Henson filed a motion to transfer the cause to the equity side of the docket on the ground that a disputed boundary line formed the real basis of the controversy and that the case could not be really determined without Henson, defendant on the law side, became complainant on the equity side and filed his bill for establishment of the boundary line.

The line which is in dispute is the south line of Section 36, Township 3, Range 1 East, in Washington County, Alabama. In the report of the case will be found a reproduction of the official government plat of this township made in 1848 and early 1849. The case really resolves itself into a contest between two surveys, one made by Tunstall Bryars in behalf of the appellant and the other by W. L. Durant in behalf of the appellee. As we understand the situation, the Bryars' survey is made in connection with what the appellant claims are the

630

only applicable field notes, that is the field notes applicable to Sections 32 and 36, while the Durant survey takes into consideration the field notes applicable, as we shall undertake to show, to the sections in the general area.

Along the west bank of the Tombigbee River in Washington County there were a considerable number of grants made to individuals prior to the systematized government survey. The result is a patchwork of surveys and irregular sections. An inspection of the township plat to which we have referred shows the irregularity of the early grants to which we have referred.

The peculiar shape of Section 36 and the sections which adjoin it both north and south, are obvious. Official government field notes are available which appear as exhibits in the present suit covering Sections 27, 33, 34 and 36. The field notes for these sections take starting points on the river or on Rain's Lake as to Section 36. From such starting points the field notes disclose the courses and distances on which the lines of the section are to be run. In several instances pointers or witness trees are noted and identified as marking corners of the section in question. However none of these pointers or witness trees can now be located and identified. The course of the river has substantially changed because of accretion at some points and erosion at others, with the result that no measurements made from the present river bank can serve as a guide for the accurate location of the corners of any of these sections.

It will be noticed that the western portion of the township is laid off in conformity with the customary method used in the survey of the public domain. This western survey had to be fitted into the earlier grants, resulting in considerable irregularity in the sections which adjoin the earlier grants.

Upon the resurvey of the western portion of the township in 1848 or early 1849, the government surveyors undertook to "tie in" their survey with these earlier grants. The field notes of this resurvey are available and appear as exhibits in this record.

We call attention to the notes covering the south line of Section 28. Section 29 is the northwest corner of the township and Section 28 lies immediately east of it. After establishing the southeast corner of Section 28, at a point 78.63 chains east of the southwest corner, the notes indicate that the surveyor ran north 2.86 chains to the south boundary of James Powell's claim (Section 27) and thence with said claim south 82 degrees east 16.50 chains to the west boundary of John Johnson's claim. This gives a definite "tie in" from which can now be located on the ground the southeast corner of Section 27.

Present day surveyors are able to locate and identify section corners in the western survey and all the surveyors who testified in the present case agree that they can thereby locate and identify on the ground the southeast corner of Section 27 to their complete satisfaction.

It will be noted that the next section line which touches one of these early grants is the south line of Section 32. This is the section which adjoins the John Johnson grant, Section 33, on the west and the James Powell grant, Section 27, on the south. It will be observed that the south line of Section 32 just misses the southwest corner of Section 33 and continues eastwardly until, according to the government plat which is in the report of the case, it strikes the west line of the Bridget Burke claim (Section 36).

The plat shows the south line of Section 32 striking the west line of Bridget Burke (Section 36), while the recitals of the field notes of Sections 32 and 36 show the south line of Section 32 as intersecting the west line of Seth Dean (Section 41). Furthermore the plat shows the NW corner of Section 36, a distance of 3.45 chains northwardly from the SE corner of Section 32, while the field notes state that the SW corner of Section 36 is 3.45 chains northwardly from the SE corner of Section 32. It is evident that the plat and the field notes here are in conflict with each other.

It will be observed that down the west line of these private grants, the next section line which intersects one of them is the

south line of Section 42, which lies immediately south of Section 32. The field notes on the south line of Section 42 show that the surveyor ran east from the southwest corner of the section and at 47.00 chains he encountered the west boundary of the Seth Dean claim, from which he ran south 8 degrees west 18.00 chains to the SW corner of said claim. The SW corner of Section 41 can, therefore, be located with certainty. If there was access to the field notes of Section 41, the NW corner of Section 41 could be located with entire accuracy. Unfortunately the field notes for Section 41 appear to be lost and are not now available.

■ There is then this obvious conflict between the field notes and the official government plat, which must be resolved. The appellant takes the position that there is a conflict between the plat and the field notes and the field notes must prevail over the plat in the event of conflict. Many authorities which undoubtedly state this to be the correct rule are cited in support of this contention. Some of the authorities are Thompson on Real Property, (Perm.Ed.), Vol. 6, § 3377; Louisiana Central Lumber Co. v. Stephenson, 13 La.App. 671, 128 So. 696; Harrington v. Boehmer, 134 Cal. 196, 66 P. 214, 489. It should be noted, however, that where there is a variance between the plat and the field notes of the original survey of public lands, the former must control, since it represents the lines and quarters as fixed by the Surveyor-General and by which the land was sold. Thompson on Real Property (Perm.Ed.) Vol. 6, § 3377; Police Jury of Vermillion Parish v. Marceaux, 13 La.App. 332, 126 So. 529; Aspinwall v. Gleason, 97 Fla. 869, 122 So. 270.

The proof in the instant case shows that the plat or survey to which reference has been made and the field notes from which the plat says it was made both recite in their certificates that they were made from a retracement of the original lines. Beyond this we do not know what the original government survey disclosed. The plat which is in the record is the plat supplied by the government in response to a request for the official plat of the township, but it shows on its face that it is based on the resurvey.

There does not appear to us to be room for the application of the exception to the general rule. Nor do we understand that the appellee is contending that the government plat introduced in evidence is the original government survey.

It is the position of the appellee, however, that the problem cannot be solved by simply saying that the field notes control when they are in conflict with the government plat. The present case, as far as we are aware, has no counterpart in the authorities.

The appellee takes the position that this "tie in" at the east end of the south line of Section 32 is directly in conflict with the field notes of Sections 27, 33 and 34. As has been pointed out, all the surveyors can locate the SE corner of Section 27 to their complete satisfaction, as based on the "tie in" to the south line of Section 28. The official government field notes for Section 27 give the length of its east line as 46.00 chains. The official government field notes for Section 33, which are in the record, give the length of the west line of Section 33 as 125.99 chains. By subtracting the length of the east line of Section 27 from the length of the west line of Section 33, it appears that the SW corner of Section 33, according to the government field notes, is 79.99 chains, in a southerly direction from the SE corner of Section 27. There can then be located with certainty, as based on the official field notes, the SW corner of Section 33 by running south 17 degrees east from the established and recognized point which marks the SE corner of Section 27. The NW corner of Section 33 is on the river bank. It will not do to start at the river bank and measure 125.99 chains to establish the SW corner of Section 33 because there is no assurance that the river bank has remained stationary. There is no doubt that the SE corner of Section 27 and the SW corner of Section 33, both of which are far removed from the river, must be located today at the same place they were located a century and a half ago when Sections 27 and 33 were originally surveyed.

Having located the SW corner of Section 33, the SE corner of that Section can

be located with certainty. That corner is to all intents and purposes the same point as the SW corner of Section 34 and is also for all intents and purposes the same point as the NW corner of the Bridget Burke claim, which is Section 36.

All the surveyors agree that if the SW corner of Section 34, which is the same point as the NW corner of Section 36, be laid out on the ground in the manner which has been outlined, it will be located approximately 3.45 chains in a northerly direction from the eastern terminus of the south line of Section 32, but the "tie in" on Section 32 says that this point constitutes the NW corner of Section 41. There then appears to be a direct and irreconcilable conflict between the field notes themselves.

The situation with reference to Section 34 is illustrative of the situation in the case at bar, although what we say here is only for purposes of illustration and is in no way binding on anyone not a party to this cause. In the event the present owners of Section 34 (The Ann Lawrence Grant) would want their lines surveyed and established, the surveyor would procure from the Bureau of Land Management (formerly the General Land Office), the same plat which appears in the present record and the same field notes. He would find it impossible, just as the appellee found, to identify any corner of Section 34 as based on its own field notes. He would start with the "tie in" on the south line of Section 28, from which he would establish the SE corner of Section 27. Then he would run south 17 degrees east 79.99 chains to establish the SW corner of Section 33. Then he would run north 73 degrees east 31.75 chains to establish the SE corner of Section 33. Then if he wants to conform strictly and exactly with the field notes, he will run south 17 degrees east 14 links to establish the SW corner of Section 34. The surveyor would find that the corner thus established conforms to the official government plat. It conforms exactly to the official field notes of Sections 28, 27, 33 and 34, and according to the testimony of Ray Daugherty in this record, it conforms to what the landowners in the area have always regarded as the true SW corner of Section 34.

Henson's Surveyor, Durant, did so establish the SW corner of Section 34 and did conclude that he had correctly so located it. He was aware of the conflict which is thus brought about with the "tie in" or connection reference on the south line of Section 32. He was also aware that this connection reference on the south line of Section 32 is repeated in the notes of Section 36. The fact remains that the field notes of Sections 36 and 32 appear to locate the SW corner of Section 36 at the same point which the field notes of Sections 28, 27, 33 and 34 (and the official plat) locate as constituting the NW corner of Section 36 (the SW corner of Section 34.)

It is unfortunate that the field notes of Section 41 have become misplaced or lost. If access could be had to the field note distance attributed to the west line of Section 41, then the NW corner of Section 41 could be located, because there is a definite location for the SW corner and it could be determined whether the NW corner of Section 41 is in fact north of the south line of Section 32 or south of the south line of Section 32. But the problem must be solved in the absence of the field notes of Section 41.

We think it can be reasonably assumed that the Surveyor General of the United States did have access to the field notes of Section 41 when he made the plat which is now supplied as being the official plat of the township. This plat was made in 1849, more than a hundred years ago. The Surveyor General must have been conscious of the conflict which now confronts us. It is obvious that he laid out Sections 33 and 34 as based upon the "tie in" of the SE corner of Section 27 to the south line of Section 28, and that he used the method which we have outlined to determine therefrom the correct location of the south lines of Sections 33 and 34. He must have been aware of the connection references which appear in the notes of Sections 32 and 36. As disclosed by the letter which the General Land Office wrote Mr. Durant in 1941, which is in evidence, the Surveyor General obviously concluded that the south line of Section 32 must strike the west boundary of the Bridget Burke claim and not the Seth Dean claim and that it is the NW corner of

the Bridget Burke claim and not the SW corner thereof, which is located 3.45 chains northerly from the eastern terminus of the south line of Section 32. It is reasonable to suppose that the Surveyor General located the NW corner of the Seth Dean claim by applying the field note length to the west line of the section to the "tie in", which definitely locates the SW corner of the section. How else could we account for the fact that the plat discloses for the western arm of Section 36 a greater width than the field notes authorize? Surely it is a fair assumption that the Surveyor General had some basis for locating these lines on his plat. The obvious manner has been shown in which he located the SW corner of Section 34, as based strictly on the official field notes of Sections 28, 27, 33 and 34. He could not have put the SW corner of Section 36 at the same point without making the western part of Section 36 fall wholly within what must be Sections 34 and 35. If the Surveyor General had laid off the western arm of Section 36 by taking his SW corner of Section 34 and applying the field note distance of 10.38 chains, he would have located the SW corner of Section 36 further north than the plat shows it to be located. The plat shows that he has attributed approximately 20 chains to this western arm of Section 36. It does not appear that the result could have been attained by the Surveyor General except to assume that he did have before him the field notes of Section 41 and that he did locate on his plat the NW corner of Section 41 to conform to the connection reference to the SE corner of Section 42.

It is insisted by the appellant that the Surveyor, Durant, in disregarding the field notes has based his survey on the plat. It does not appear to us that that is Durant's position. If it were, he would have attributed to the western arm of Section 36 a greater width than the field notes attributed to it by way of conforming to this official plat. The contention of the Surveyor, Durant, appears to be that having located the SW corner of Section 34 in a manner which conforms to the field notes, to the plat and to the recognized ownership lines on the ground, that point should then be taken as constituting the NW corner of Section 36

and Section 36 laid out therefrom, as based upon its own field notes. In so doing the Surveyor, Durant, has apparently followed the lead of the Surveyor General of the United States.

If the theory of Bryars, the Surveyor of Bilbo, is accepted, and we take the "tie in" of Section 32 as controlling, the result will be to distort the whole picture. Section 36 would be pushed up into what really constitutes Sections 34 and 35 and Sections 40 and 41 would be pushed up about 20 chains further north than the township plat extends them, which would result in greatly increasing their acreage.

We do not find in the authorities any statement of principle for the situation which appears in the present case. The rules and principles which are laid down in the decisions cannot be made to fit this particular situation because in the present case there is not only a conflict between the field notes and the plat, but there is a conflict between two different sets of field notes and the unfortunate disappearance of the one set of field notes which might have afforded a solution or key to the difficulty.

■ According to the testimony of Durant his south line of Section 36 struck Bilbo Creek about 180 feet from where it empties into the river. There is testimony tending to show that the stake of Durant is about 400 feet from the river. After the case was closed and submitted, a motion was made by the respondent to reopen the case so that further evidence could be taken to show Durant's alleged mistake. Before the motion was acted on, Durant died. The court refused to grant the motion. This ruling is assigned as error. That was matter which addressed itself to the discretion of the court, and since we fail to see any abuse of discretion, we find no error in this ruling.

■ Fundamentally the effort is to show Durant's digression from the official field notes of Section 36 which show the south line of the section as striking the river. Durant in his testimony admitted this inconsistency with the official field notes. But it is obvious that in the period of the

past hundred years, a point which was on the river could now be on Bilbo Creek.

We feel satisfied that the dispute involved in the present case should not be settled upon the proof as to where the south line of Section 36 strikes the river, but by a determination of the correct location of the SW corner of Section 36. It is from this point that the south line of Section 36 must be run on a course as prescribed in the field notes to strike whatever it may now strike. The changing course of rivers and streams over a considerable period of time is too well known to require further comment.

According to the Surveyor, Durant, the proper thing to do is to work out the confusion on the basis which will most nearly conform to the pattern of the area in its entirety. This is what the lower court undertook to do and we are not sufficiently convinced to say that the lower court was wrong.

Accordingly, the decree of the lower court is due to be affirmed.

Affirmed.

LAWSON, SIMPSON and MERRILL, JJ., concur.